THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HELEN STALLINGS, Defendant-Appellant.

First District (1st Division)   No. 78-1230

Opinion filed April 21, 1980.

James J. Cutrone, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and William G. Gamboney, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

After a bench trial, Helen Stallings was found guilty of delivery of a controlled substance and sentenced to a term of imprisonment of 4 years to 4 years and 1 day in the Illinois Department of Corrections. On appeal, defendant contends that her conviction cannot stand because (1) the evidence of entrapment was not refuted by the State and (2) the verdict of guilt was inconsistent with the acquittal of her co-defendants.

We affirm.

Helen Stallings, Sherman Neals, Andre Reidgnal, and Ernest Cross were charged by information with delivery of a controlled substance and calculated criminal conspiracy.

Among the witnesses called by the State were George Murray and James Rose. George Murray, an undercover police officer, testified that on October 11, 1977, at approximately 10 p.m., he and James Rose went to Helen's Barbeque Stand, 214 E. 58th Street, Chicago. They went into the office area where Rose phoned someone to arrange a sale for a large quantity of heroin. After waiting 1½ to 2 hours, they were approached by Andre Reidgnal, defendant's son, who stated that he knew they were in Chicago to purchase heroin. Reidgnal handed them a business card with a phone number printed on the reverse side and assured them that either he or Mrs. Stallings would supply them with narcotics on the following day.

Murray further testified that on the following afternoon, he, Rose and several police agents met and made plans for the purchase and surveillance. From a nearby phone booth, Rose called the number on the business card and Murray then obtained $10,000 from the Department of Law Enforcement. At approximately 3:15 p.m. Murray and Rose went to Mrs. Stallings' home.

Mrs. Stallings, Andre Reidgnal and Sherman Neals were present when Rose and Murray arrived. Defendant told Murray and Rose that they should not have left the barbeque stand the night before because she had been able to get the package together for them. Rose introduced Murray as his friend "Tony from St. Louis" who "would be up from now on to buy dope," and Stallings replied that this would be no problem.

Defendant showed Murray different narcotic test kits and several books about narcotics. She also made two phone calls in order to obtain the heroin for Murray. Shortly after the second call, Ernest Cross and Jacqueline Brown arrived at defendant's home. Cross handed plastic bags containing a brown powder to defendant. Murray left to get the money from his car and when he returned defendant handed him a handful of packets containing the brown powder. It was later stipulated that the

substance positively reacted for heroin. Neals, whom defendant had previously introduced as her "dope tester," prepared to test the heroin. Murray then announced that he was a police officer and placed everyone under arrest.

On cross-examination, Murray stated that he did not search the apartment before he left and that the books, narcotic test kits and scale were left at the residence. He also testified that Rose knew defendant because Rose told him that he had previously purchased drugs from her.

James Rose, an informant, testified that he had been convicted for possession of heroin and was advised that any help he provided the Government would be taken into consideration in his case. He stated that on October 11, 1977, Murray and Rose went to Helen's Barbeque Stand. Reidgnal telephoned defendant and Rose spoke to her and told her that he was in town to buy 10 ounces of "dope." Defendant said she could get the package together for him. When they prepared to leave approximately 1½ hours later, Reidgnal gave them a business card with a phone number printed on the reverse side and told them to call that number the next day.

When Rose called the next day, defendant stated that she had been able to get the heroin the night before. Rose and Murray went to defendant's home. Reidgnal and Neals were also present and they all conversed about drugs. Defendant and Murray later talked about narcotic test kits and drug mixtures described in a magazine. Rose also stated that defendant made two phone calls while he was there and, after the second call, she explained that the conversation was about drugs and that 10 ounces of "dope" were being brought to her home. Cross and a woman entered the apartment shortly thereafter, and Cross handed several packets to defendant who, in turn, handed them to Murray when Murray returned from his car with the money. Thereafter, Murray arrested everyone there, except Cross who ran out of the house.

Defendant, testifying on her own behalf, stated that Rose and Murray, whom Rose introduced as his friend "Tony," arrived at her home at approximately 3 p.m. on October 12, 1977. Shortly after they arrived, she and Rose entered her bedroom and Rose stated that Murray had a large sum of money and that Rose wanted to "rip him off". Rose further told defendant that he brought Murray to Chicago to buy drugs and asked her if she knew where they could get some. When defendant replied that she did not know where they could purchase some drugs, Rose replied that he did and that "if it went off," he would give her $1,000.

Defendant further testified that Rose made a phone call while Murray was out of the house. She heard Rose ask, "B, you still got ten of those things I gave you?" Rose also gave "B" her address. After Rose completed the call, he told defendant that everything had been arranged.

Approximately 45 minutes later, a man, whom Rose identified as "B", arrived. Defendant, Rose, and "B" went into defendant's bedroom. After Rose asked "B" if he had brought "10 of those things", "B" handed Rose a paper bag and Rose told defendant to put the bag in her drawer.

Cross and Brown arrived at defendant's home at about 6 p.m. Defendant "got a nod from Rose," went back into the bedroom, and opened the brown bag. She took the packets containing the material out of the bag and put them in her pocket. She then told Murray to get his money. Murray returned in 5 minutes and as defendant started to take the packets out of her pocket, Murray arrested her. She denied handing any packets to Murray.

The prosecution called Officer Johnson in rebuttal. Johnson stated that he was part of the surveillance team on October 12, 1977, and saw an unidentified man get out of a car and go into defendant's home. The man was not carrying anything and left the area about 25 minutes after he arrived.

It was also stipulated that defendant had been convicted of possession of a controlled substance in September 1977.

Following closing arguments defendant was found not guilty of calculated criminal conspiracy and guilty of delivery of a controlled substance.

Defendant first contends that the prosecution failed to contradict her testimony that the Government supplied the heroin. She contends that her conviction must therefore be reversed because entrapment was thereby established as a matter of law.

We cannot agree with defendant's statement that the prosecution did not offer evidence refuting defendant's testimony. Rose and Murray testified during the prosecution's case-in-chief that the defendant voluntarily agreed to locate drugs for them and that defendant made two phone calls from her home in an attempt to do so. Murray testified that defendant was talking to a person on the phone when he entered the house after moving his car from the driveway and Rose stated that defendant, not he, spoke to the unidentified man who entered the house. Moreover, while defendant testified that "B" carried a brown bag with him as he entered the home, Johnson testified in rebuttal that the man carried nothing in his hands. Also, both Murray and Rose stated that Cross delivered the narcotics to defendant.

The trial court did not believe that Cross delivered the heroin to defendant and consequently acquitted him. Defendant therefore alleges that the heroin was conceivably supplied by the Government. However, this fact, in and of itself, does not establish entrapment.

The entrapment statute (Ill. Rev. Stat. 1977, ch. 38, par. 7—12) is, in part, designed to protect an innocent person induced by the Government

to commit an offense which he would not otherwise have committed. (See Ill. Ann. Stat., ch. 38, par. 7—12, Committee Comments, at 438 (Smith-Hurd 1972).) However, entrapment is not established merely by the fact that the Government supplied the substance; predisposition, as well as government involvement, must be considered. *People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812.

■■■ Assuming *arguendo* that the heroin was supplied by Rose or another government agent, we find ample evidence in the record which indicates defendant's predisposition to commit the offense and defeats the defense of entrapment. Both Rose and Murray testified that defendant owned several books about narcotics and that she described the function of various narcotic test kits. They also stated that she possessed drug paraphernalia. Murray testified that Rose had purchased narcotics from defendant in the past and that defendant agreed to "deal" with Murray in the future. A familiarity with drug paraphernalia and an expressed desire to do business in the future are indicative of predisposition. *People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812.

Defendant also argues that because the evidence upon which she was convicted was identical to that upon which her co-defendants were acquitted, reasonable doubt of her guilt exists.

We find that the evidence against Reidgnal, Cross and Neals was substantially different from the evidence against Stallings. The record discloses no evidence that Reidgnal or Neals delivered drugs to anyone. The only evidence against Cross was the testimony of Murray and Rose that Cross handed plastic packages to defendant after he entered the home. In acquitting Cross, the trial court noted that the police report did not state that Rose saw Cross hand the packets to defendant and found it incredible that Cross would have delivered $10,000 worth of heroin in the presence of strangers.

Conversely, the prosecution elicited testimony establishing defendant's involvement on the day prior to delivery. This testimony was uncontradicted by defendant. Also, Stallings' ability and efforts to procure the drugs for Murray and Rose and her familiarity with drugs was attested to at length. In short, a greater quantity of evidence was produced by the State against defendant than against her co-defendants.

■■ It is the duty of the trial court to weigh the evidence and credibility of the witnesses. (*People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812; *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) Because the evidence offered against all the defendants was not identical, inconsistent findings were not improper. *People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671; *People v. Stinson* (1977), 47 Ill. App. 3d 910, 365 N.E.2d 467.

■■ We also note that the co-defendants did not raise entrapment as a defense. On the other hand, Stallings admitted the acts incident to the

offense charged by asserting entrapment and is thus guilty of such offense unless the court finds entrapment. (*People v. Terry* (1976), 38 Ill. App. 3d 795, 349 N.E.2d 129, citing *People v. Nahas* (1973), 9 Ill. App. 3d 570, 292 N.E.2d 466.) As previously indicated, Stallings was predisposed to commit the offense and entrapment therefore did not exist. Hence, the trial court did not err in rendering inconsistent findings.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

GOLDBERG, P. J., and O'CONNOR, J., concur.